| | |
|---|---|
| 1 | Kassra P. Nassiri (215405) |
| | (kass@njfirm.com) |
| 2 | Russell Taylor (320375) |
| | (russ@njfirm.com) |
| 3 | NASSIRI & JUNG LLP |
| | 1700 Montgomery Street, Suite 207 |
| 4 | San Francisco, California 94111 |
| | Telephone:  (415) 762-3100 |
| 5 | Facsimile:   (415) 534-3200 |
| 6 | Attorneys for Plaintiff |
| | Ashwin Gopinath |

**SUPERIOR COURT OF CALIFORNIA**

**FOR THE COUNTY OF SAN DIEGO**

| | |
|---|---|
| ASHWIN GOPINATH, an individual, | Case No.: _____ |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | 1)  **Declaratory Judgment** |
| SOMALOGIC, INC., a Delaware corporation; and DOES 1 through 20, inclusive, | 2)  **In the Alternative, Wrongful Discharge in Violation of Public Policy** |
| Defendants. | **JURY TRIAL DEMANDED** |
| | **CONDITIONALLY UNDER SEAL** |
| | *May Not Be Examined Without Court Order - Contains material from conditionally sealed record.* |

COMPLAINT

Plaintiff Dr. Ashwin Gopinath ("Plaintiff"), by and through his attorneys of record, allege as follows:

## INTRODUCTION

1. In 2022, Defendant SomaLogic, Inc. acquired Palamedrix, Inc., an innovator in DNA nanotechnology.

2. ███████████████████████████████████████████████████████████████████████████████████████████████████

3. From the beginning, SomaLogic encouraged – actively and through its poor management – former Palamedrix employees to quit.

4. ███████████████████████████████████████████████████████████████████████████████████████████████████

5. ███████████████████████████████████████████████████████████████████████████████████████████████████

6. Unsurprisingly, after SomaLogic's acquisition, many former Palamedrix employees quit. This included four of Dr. Gopinath's six direct reports. These talented scientists were critical to the success of Palamedrix. And their loss substantially limited Dr. Gopinath from continuing his research and development. SomaLogic then failed to support Dr. Gopinath in recruiting new, equally qualified candidates.

7. When Dr. Gopinath brought these serious issues to SomaLogic's leadership, including Mr. Bowen and SomaLogic's Chief Technology Officer, Jason Cleveland, they blew him off.

1
COMPLAINT

8. When Dr. Gopinath informed SomaLogic that he had Good Reason to resign, they banned him from the office and started assigning him bizarre projects.

9. Concerned with SomaLogic's culture, Dr. Gopinath emailed an optional, anonymous survey to his colleagues about their experiences at SomaLogic. In response, SomaLogic deleted the email from each recipient's inbox and revoked Dr. Gopinath's access to his email account and SomaLogic's systems.

10. About one month later, Dr. Gopinath resigned for Good Reason. After he resigned, SomaLogic purported to terminate Dr. Gopinath for Cause so that Dr. Gopinath's stock would be forfeited.

11. Dr. Gopinath seeks an order declaring that he resigned for Good Reason. Dr. Gopinath also brings a claim for wrongful discharge in the alternative.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this case because more than $25,000 is at issue, exclusive of attorneys' fees and costs.

13. Venue is appropriate in this Court because the County of San Diego is where Dr. Gopinath was employed, where the contract was made, where the parties intended the contract to be performed, and where other acts relevant to this Complaint occurred.

## PARTIES

14. Plaintiff Dr. Ashwin Gopinath received his Ph.D. in electrical engineering from Boston University in 2010. He then worked at Caltech and Google as a research fellow and scientist. His research at Caltech involved developing scalable tools for integrating biomolecules with semiconductor devices as well as machine learning algorithms. While at Google, Dr. Gopinath developed novel physical molecular computing platforms, high-throughput biosensors as well as generative AI tools for time-varying data. Dr. Gopinath's main research is at the intersection of DNA nanotechnology, micro-fabrication, synthetic biology, optical physics, and materials science. His main research is on DNA origami and design, up to wafer-scale self-assembly with molecular-scale control, and possibilities for microfabricated devices. Dr. Gopinath has coauthored several dozen papers in journals like Nature, Science, and PNAS, and

has received several awards, the most recent of which was the Robert Dirk Prize in molecular programming for his seminal contributions in merging DNA nanotechnology with conventional semiconductor nanofabrication.

15. Defendant SomaLogic, Inc. is a protein biomarker discovery and clinical diagnostics company. It is incorporated in Delaware and has offices in San Diego, California.

16. Plaintiff is ignorant of the true names or capacities of the defendants sued herein under the fictitious names DOES 1 through 20 inclusive.

## FACTS

**I.   Dr. Gopinath Cofounded Palamedrix, a Successful DNA Nanotechnology Company.**

17. Dr. Gopinath, Dr. Paul Rothemund, and Shane Bowen founded Palamedrix, Inc., based out of San Diego with La Jolla-based offices and lab space.

18. Palamedrix was an innovator in DNA nanotechnology. Palamedrix's technology used DNA-based biosensors that captured small molecules present in biological samples to pinpoint the presence of any analyte with single-molecule accuracy. Its platform could organize and interrogate many millions of these biosensors on a surface to deliver comprehensive data and a complete view of a patient's biochemistry from a single sample.

19. Dr. Gopinath was the co-founder and Chief Technology Officer at Palamedrix. He was responsible for the research and development of the core technology. Dr. Gopinath was also in charge of identifying the best technical talent able to execute Palamedrix's R&D vision. Dr. Gopinath was responsible for overseeing all the research progress, keeping track of the progress on patent filings, ensuring the lab activities were progressing on schedule, and ensuring progress toward the company's goals.

20. Palamedrix secured 45 valuable patents related to the structure and methods for detection of sample analytes; substrate for single molecular organization; integration of a protein colocalization device onto a microfluidic device; solution phase single molecule capture and associated techniques; monoclonal polony generation and spatial organization using nucleic acid supramolecular structures; methods of quantification and identification of molecules;

monofunctional particles; solution phase single molecule capture and associated techniques; and substrate-based protein assay without protein substrate binding.

21. Forty-two of Palamedrix's forty-five patents were spearheaded by Dr. Gopinath.

**II.    Palamedrix Was Acquired by Soma Logic for Its IP.**

22. In 2021, Defendant SomaLogic, Inc. approached Palamedrix about a potential acquisition.

23. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

25. On July 25, 2022, SomaLogic and Palamedrix executed an Agreement and Plan of Merger ("Merger Agreement"). The Merger closed on August 31, 2022.

26. Under the Merger Agreement, SomaLogic agreed to pay $35 million to Palamedrix, comprising $14 million cash on closing and $21 million in SomaLogic common stock ("Upfront Stock Consideration"). The Upfront Stock Consideration was divided between Palamedrix's founders, including Dr. Gopinath.

//

//

**A.      Under the Merger Agreement, Palamedrix's Founders Received Upfront Stock Consideration.**

27.     In connection with the Merger Agreement, SomaLogic provided Dr. Gopinath with a Founder Side Letter Agreement, dated July 25, 2022 ("Founder Side Letter").

28.     Under the Founder Side Letter, Dr. Gopinath's Upfront Stock Consideration was fully vested "subject to the risk of forfeiture in accordance with the following terms and conditions: (a) 27.78% of your Upfront Stock Consideration will be automatically forfeited if your employment with the Acquiror terminates prior to the 12-month anniversary of the Closing Date. (b) 27.78% of your Upfront Stock Consideration will be automatically forfeited if your employment with the Acquiror terminates prior to the 24-month anniversary of the Closing Date. (c) 27.77% of your Upfront Stock Consideration will be automatically forfeited if your employment with the Acquiror terminates prior to the 36-month anniversary of the Closing Date."

29.     But if Dr. Gopinath's employment "is terminated without Cause or if [he] resign[s] for Good Reason . . . then one hundred percent (100%) of [his] Upfront Stock Consideration will no longer be subject to forfeiture."

30.     "Good Reason" is defined in the Merger Agreement as:

> … the occurrence of any of the following, in each case during any Founder's employment with the Acquiror (or the Surviving Company) and without the Founder's written consent: (1) a material reduction in, or failure to pay, such Founder's base salary, other than a general reduction in salary that affects all similarly-situated employees in substantially the same proportions (it being agreed, for the avoidance of doubt, that any changes to such Founder's base salary that are consistent with a change applied to all of the Company's similarly-situated employees (not to exceed a ten percent (10%) reduction in total compensation) shall not be deemed a material reduction); (2) a material reduction in such Founder's aggregate incentive compensation opportunities (including, but not limited to, equity awards and target cash bonus) or failure to pay any earned bonus (it being agreed, for the avoidance of doubt, that (i) any changes to such Founder's incentive compensation opportunity that has not yet been earned that are consistent with a change applied to all of the Company's similarly-situated employees shall not be deemed a material reduction; and (ii) 'aggregate incentive compensation opportunities' does not include the ultimate payout of amounts achievable pursuant to such opportunities); (3) a relocation of such Founder's principal place of employment by more than thirty-five (35) miles; (4) a material, adverse change in such Founder's title, authority, duties or responsibilities; (5) the Acquiror, the

Surviving Company, or any of their respective Subsidiaries or Affiliates requesting that the Founder engage in illegal or fraudulent conduct; (6) the Founder to continue to work remotely in accordance with the Founder's regular and customary manner of working during his prior employment with/providing services to Palamedrix, Inc., which is the equivalent of working three (3) days in the office per workweek and working other days remotely; provided, that the foregoing shall not constitute 'Good Reason' for this subsection (5) in the event that the Acquiror, the Surviving Company, or any of their respective Subsidiaries or Affiliates institute a general requirement for all similarly-situated employees and requires such employees to work in the office every Business Day (it being agreed, for the avoidance of doubt, that any exceptions to this general requirement offered to other similarly-situated employees will likewise be offered to such Founders in order not to qualify as 'Good Reason' under this subsection (5)); or (7) the Acquiror's, the Surviving Company's or any of their respective Subsidiaries' or Affiliates' material breach of any written agreement between any of them and such Founder.

31. The Founder Side Letter also contains an integration clause, which provides that "[t]his Side Letter constitutes the entire agreement by and between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, written or oral, of the parties."

32. After the merger closed, SomaLogic provided Dr. Gopinath with his Upfront Stock Consideration. Later, SomaLogic removed the restrictive legend on his shares.

**B.     The Merger Agreement Also Provided for Additional Consideration Upon the Achievement of Certain Milestones.**

33. On top of the cash and Upfront Stock Consideration, the Merger Agreement also provided that up to an additional $17.5 million may be paid in connection with the achievement of certain revenue-based milestones ("Milestones" or "Milestone Consideration").

34. Under Section 2.16 (g) (i) of the Merger Agreement, any Founder is entitled to his portion of the Milestone Consideration "owed upon the achievement of a Milestone if, on the date such Milestone is achieved," either (A) the Founder remains a full-time employee or (B) "such Founder's Upfront Stock Consideration that was subject to vesting had fully vested prior to the termination of his employment." But as with the Upfront Stock Consideration, if the Founder's employment is terminated without Cause or if the Founder resigns for Good Reason, then the

1 Founder "shall remain eligible to receive his applicable portion of such Milestone Consideration owed upon achievement of any and all subsequent Milestones."

### C. In Connection with the Merger, SomaLogic and Dr. Gopinath Agreed to a New Employment Agreement.

35. At the time of the Merger, SomaLogic employed Dr. Gopinath as Senior Director, Assay Development. Dr. Gopinath's offer letter stated that his "duties and responsibilities will largely remain similar to those you had with Palamedrix," though "SomaLogic may from time to time assign different and additional duties," and that he would "report[ ] to Shane Bowen, Vice President and General Manager, San Diego."

36. Dr. Gopinath's offer letter also required that "[a]s a condition of [his] employment by SomaLogic," he must "agree to sign and be bound by the Confidentiality and Intellectual Property Agreement."

37. Dr. Gopinath's offer letter also provided that "[a]ny dispute arising in connection with this offer shall be submitted to the District Court of the 20th Judicial District, Boulder County, Colorado."

38. Dr. Gopinath accepted SomaLogic's offer.

## III. SomaLogic Bungled the Palamedrix Acquisition.

39. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40. From the start, SomaLogic encouraged former Palamedrix employees to quit. The first interaction many former Palamedrix employees had with any SomaLogic senior executives was with Ms. Roelke. She told former Palamedrix employees, "You can sign the employment contract and quit one day after closing." Former Palamedrix employees interpreted Ms. Roelke to mean they would no longer be needed once the acquisition was finalized.

41. SomaLogic did not consider offering retention bonuses for former Palamedrix employees until several months later, and only after Dr. Gopinath lobbied SomaLogic for retention bonuses. Even then, SomaLogic denied requests by female former Palamedrix

1    employees for retention bonuses. In doing so, SomaLogic claimed that retention bonuses were
2    "unusual and not the market standard." Yet SomaLogic did pay retention bonuses to male former
3    Palamedrix employees.
4      42. SomaLogic refused to negotiate salary and titles for former Palamedrix employees.
5      43. SomaLogic also prevented former Palamedrix employees from continuing their
6    research and development. For the first six weeks following the closing, SomaLogic strongly
7    discouraged former Palamedrix employees from purchasing materials necessary for their
8    research. It also made the purchasing process extremely difficult – so difficult, that former
9    Palamedrix employees could only conclude that SomaLogic's obstinance was intentional. This
10   further discouraged former Palamedrix employees. SomaLogic continued to make it
11   unnecessarily difficult for former Palamedrix employees to buy even the most basic supplies for
12   research.
13     44. On top of its more active mismanagement, SomaLogic also disregarded the
14   concerns of Palamedrix employees. After the Merger Agreement was signed, but before the
15   closing, SomaLogic missed its earning target for the quarter and publicly stated that SomaLogic
16   planned to cut $75 million in operating expenses. SomaLogic's financial struggles and public
17   statements led former Palamedrix employees to fear for their future at SomaLogic. SomaLogic
18   made no effort to alleviate their concerns.

19   **IV. SomaLogic Promotes a Culture of Gender Inequality and Discrimination.**
20     45. [REDACTED]
21   [REDACTED]
22     46. [REDACTED]
23   [REDACTED]
24   [REDACTED]
25   [REDACTED]
26   [REDACTED]
27   [REDACTED]
28   [REDACTED]

1  47. █████████████████████████████████
2  █████████████████████████████████████
3  █████████████████████████████████████
4  ███████████
5  48. ████████████████████████████
6  █████████████████████████████████████
7  ████████████████████
8  49. █████████████████████████████████
9  ████████████████████████████████
10 █████████████████████████████████████
11 ███████████████████████████████
12 ███████████
13 50. █████████████████████████████████
14 █████████████████████████████████████
15 █████████████████████████████████████
16 ███████████

## V. SomaLogic's Bungling of the Palamedrix Acquisition and Its Toxic Culture Led Most of Dr. Gopinath's Former Palamedrix Team to Quit.

51. SomaLogic's bungling of the Palamedrix acquisition, its mismanagement of former Palamedrix employees, and its promotion of Mr. Bowen led most of Dr. Gopinath's team from Palamedrix to quit.

52. █████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████

53. █████████████████████████████████
█████████████████████████████████

1 ██████████████████████████████████████████████
2 ██████████████████████████████████████████████
3 ████████████████████████████████████████████
4 ██████████████████████████████████████████████
5 ██████████████████████████████████████████
6 ████████████████████████████████████████████
7 ██████████████████████████████████████████████
8 ██████████████████████████████████████████
9 ████████████████████████████████

54. The loss of former Palamedrix employees substantially impaired Dr. Gopinath's ability to execute his duties and responsibilities and achieve the Milestones.

55. SomaLogic impeded Dr. Gopinath's attempts to replace these former Palamedrix employees. It also refused to provide any timeline as to when replacements for these individuals could be hired. Nor did SomaLogic provide Dr. Gopinath with the budget needed to hire their replacements.

56. SomaLogic did not provide Dr. Gopinath with the budget to hire a complete and qualified team needed to achieve the Milestones.

**VI.  Dr. Gopinath's Concerns Are Ignored Until He Informs SomaLogic that He Would Like to Resign.**

57. Dr. Gopinath brought his concerns to Jason Cleveland, SomaLogic's Chief Technology Officer, and to Mr. Bowen. They went unaddressed.

58. In November 2022, Dr. Gopinath notified SomaLogic that he had Good Reason to resign.

59. In response, Dr. Gopinath was banned from SomaLogic's offices.

60. SomaLogic also made unreasonable demands of Dr. Gopinath. First, it demanded that Dr. Gopinath provide a written summary of people he had spoken with about a unique technical capability that he was exploring and a written summary of his proposed ideas. When Dr. Gopinath requested similar work product for him to review as exemplars, SomaLogic refused.

1 Instead, it provided him with an unrelated, 13-year-old technical report to be used as an example
2 of "good English."

3     61.    Second, Mr. Cleveland and Mr. Bowen demanded that Dr. Gopinath memorialize
4 in writing his opinions about certain IP issues. This unusual project was not assigned in good
5 faith. Concerned, Dr. Gopinath approached SomaLogic's Deputy General Counsel and its Senior
6 Vice President of Licensing and IP Strategies. Both advised Dr. Gopinath *not* to put his opinions
7 about IP in writing.

8 **VII.   SomaLogic Punished Dr. Gopinath Further When He Tried to Address ▄▄▄**
9 **▄▄▄ Inappropriate Behavior Toward Women.**

10     62.    ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄, Dr. Gopinath heard from SomaLogic's
11 female employees that (1) SomaLogic's management neglected their concerns; (2) SomaLogic's
12 policies about promotions and goal setting are unclear and confusing; (3) SomaLogic's leadership
13 actively isolates employees from speaking with their colleagues in other departments, to the point
14 that most scientists at SomaLogic are unable to fully perform their roles; (4) SomaLogic's
15 leadership does not listen to the concerns or suggestions of its scientists; and (5) employees feel
16 unsafe at SomaLogic.

17     63.    These conversations – and his personal experiences – left Dr. Gopinath deeply
18 concerned with SomaLogic's toxic culture. So, on March 12, 2023, Dr. Gopinath emailed an
19 anonymous, short survey to his colleagues about SomaLogic's culture. As Dr. Gopinath
20 emphasized, the survey was "a purely optional and voluntary exercise." His stated goal was to
21 "drive conversations between employees." His email also provided a link to SomaLogic's Code
22 of Conduct and Ethics for reference.

23     64.    The survey comprised ten questions: "1. Do you get adequate information from
24 your supervisors/managers to perform your work? 2. Do you believe the leadership is
25 transparent? 3. Do you feel the company values diversity and inclusion? 4. Have you experienced
26 any retaliation or negative consequences for speaking up about any issue? 5. Do you feel that the
27 company provides adequate support for employee mental health and wellbeing? 6. Do you feel
28 that the company's performance evaluation and promotion processes are transparent and

unbiased? 7. Have you experienced harassment or discriminatory behavior? 8. Do you feel psychologically safe within the company? 9. Do you feel that your issues or concerns are heard and addressed by the HR? 10. Do you have open comments?"

65. In response, SomaLogic deleted Dr. Gopinath's email from every recipient's inbox.

66. Over one dozen SomaLogic employees did see the email before it was deleted, however. These employees, including former Palamedrix employees and non-former Palamedrix employees, scientists, directors, and vice presidents, contacted Dr. Gopinath to express their dismay and confusion about SomaLogic's decision to delete the email from every recipient's inbox. Each was surprised that SomaLogic had deleted the email from their inbox. Based on these conversations, Dr. Gopinath learned about more, disturbing problems at SomaLogic. These SomaLogic employees reported to Dr. Gopinath: (1) the lack of transparency around data, knowledge, and sharing within SomaLogic. One person reported that he felt the leadership is "actively isolating teams"; (2) SomaLogic's complete disregard for gendered language by SomaLogic's leadership; (3) opaque administrative procedures being introduced under the guise of being a newly public company; and (4) "there is a lot of talk of diversity but absolutely no action."

67. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

68. On March 13, 2023, Dr. Gopinath emailed SomaLogic's Board of Directors. Dr. Gopinath reported that, "[s]ince joining Somalogic, I have faced problematic behavior from my chain of command and HR . . . . And, I have tried to resolve the issues through respectful conversations with leadership. However, I have received only vague responses, attempts to pass the blame onto me, and stall tactics. Therefore, I am taking the rather unusual step of reaching out to [the Board] for help."

69. Dr. Gopinath also shared that he was "concerned about the problematic behavior of the leadership, which also impacts my ability to represent the company to potential partners and hires. As someone deeply involved in the research community at institutes like MIT, Harvard, Caltech, and Stanford, it is increasingly difficult for me to recruit partners and candidates without speaking candidly about my experiences at SomaLogic."

70. Dr. Gopinath listed four "key issues" that he had faced at SomaLogic. "1. Several members of the Palamedrix team, including six out of nine scientists, quit after the acquisition due to the collective behavior of Somalogic leadership. These were highly talented individuals who cannot be replaced. This severely impacted my teams' ability to operate and in my point of view this ensures that Palamedrix team will not be able to meet the technical milestones listed in the merger agreement. 2. A significant portion of former Palamedrix employees who quit were women. Their decision was due to the gender-biased actions of a single individual. And, from the employees' perspective, this was done with the complete support of the Somalogic leadership and HR. 3. When I brought these issues to the attention of Jason Cleveland, Shane Bowen, and others in leadership, I was systematically mistreated. Specifically, I was immediately asked to work remotely, given vague tasks with unclear instructions, and asked to create an IP paper trail that could create issues for Somalogic, for which I would likely be blamed later. Additionally, my requests to access existing company work products to properly orient myself with the company expectations were consistently rejected, causing delays in productivity. 4. Throughout this entire ordeal, the HR team played almost no role in conflict resolution, despite being aware of the situation."

71. Dr. Gopinath expressed his concern that "there is a systemic problem with the Somalogic culture and leadership, which if left unchecked, will erode employee productivity and morale, leading to a loss of market share. As one of the only immigrants and persons of color in a senior role, I feel it is my duty to get to the bottom of these issues as I believe these are systemic within the organization."

72. Dr. Gopinath also explained that he sent the survey "to determine if my experiences are unique or is this indicative of systemic issues within the organization. The result

can be viewed at the end of the survey and I will share the results with the board in the coming weeks."

73. The same day Dr. Gopinath brought his concerns to SomaLogic's Board, SomaLogic revoked Dr. Gopinath's access to SomaLogic's systems and his SomaLogic email account.

74. About one month later, Dr. Gopinath resigned.

75. On April 10, 2023, at 1:14 p.m. Pacific Time, Dr. Gopinath emailed his resignation to Jason Cleveland, SomaLogic's Chief Technology Officer, Shane Bowen, SomaLogic's Vice President of Technology Development, Dr. Paul Rothemund, and Ruben Gutierrez, SomaLogic's General Counsel. Dr. Gopinath resigned "effective immediately."

76. Mr. Cleveland and Mr. Ruben first read Dr. Gopinath's email at 1:15 p.m. and 1:16 p.m., respectively. They re-opened Dr. Gopinath's email several more times between then and 1:55 p.m.

77. At 1:55 p.m., SomaLogic's Business Partner, People & Culture, emailed Dr. Gopinath, purporting to terminate Dr. Gopinath. This email attached a termination letter and stated "[a]s noted in the attached termination letter, your employment with SomaLogic has been terminated effective immediately."

78. Later, SomaLogic demanded that Dr. Gopinath return his Upfront Stock Consideration.

## FIRST CAUSE OF ACTION

### (Declaratory Judgment)

79. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

80. An actual controversy has arisen and now exists between SomaLogic and Dr. Gopinath. Specifically, Dr. Gopinath seeks a declaration that he resigned for "Good Reason," as defined in the Merger Agreement.

81. A determination of this issue is necessary and appropriate at this time, in order that SomaLogic and Dr. Gopinath may establish their rights, duties, and obligations to each other

under the Founder Side Letter. Further, SomaLogic has demanded that Dr. Gopinath immediately return his Upfront Stock Consideration.

82. There was a material, adverse change in Dr. Gopinath's title, authority, duties, and responsibilities, as detailed above.

83. Dr. Gopinath did not consent in writing to these material, adverse change in Dr. Gopinath's title, authority, duties, and responsibilities.

## SECOND CAUSE OF ACTION

**(Wrongful Discharge in Violation of Public Policy)**

84. Plaintiff incorporates by reference the allegations contained in all preceding paragraphs of this complaint.

85. Plaintiff brings this cause of action in the alternative. Dr. Gopinath resigned for Good Reason. But if it is found that Dr. Gopinath did not resign for Good Reason, then his termination was wrongful.

86. Dr. Gopinath's refusing to condone and reporting of gender discrimination and harassment was a substantial motivating reason for his discharge.

87. Dr. Gopinath was harmed.

88. The discharge was a substantial factor in causing Dr. Gopinath's harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

A. A declaration by a jury that Dr. Gopinath resigned for Good Cause, as defined in the Merger Agreement;

B. Compensatory damages in an amount to be determined at trial;

C. Pre- and post-judgment interest in the maximum amount permitted or provided for by law;

D. Exemplary and punitive damages to the fullest extent permitted by law;

E. Attorneys' fees, costs, and expenses;

F. Any other relief that is deemed just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury.

DATED: April 28, 2023

Respectfully submitted,
NASSIRI & JUNG LLP

By: _____

Kassra P. Nassiri
Russell Taylor
Attorneys for Plaintiff
Dr. Ashwin Gopinath

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 523 West 6th Street, Suite 400, Los Angeles, California 90014.

On May 26, 2023, I caused the foregoing document(s) described as to be served:

**DECLARATION OF CASSIDY M. O'SULLIVAN IN SUPPORT OF DEFENDANT SOMALOGIC, INC.'S MOTION TO SEAL**

on the person(s) below, as follows:

> Kassra Nassiri
> kass@njfirm.com
> Russell Taylor
> russ@njfirm.com
> NASSIRI & JUNG LLP
> 1700 Montgomery Street, Suite 207
> San Francisco, CA 94111

[X] **BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused such document(s) to be electronically served to those parties listed above from e-mail address mgreen@hueston.com.  The file transmission was reported as complete and a copy of the Service Receipt will be maintained with the original document(s) in our office.

[ ]  (BY MAIL) I enclosed the document(s) in a sealed envelope or package addressed to the person(s) at the address(es) listed above and placed the envelope for collection and mailing at Hueston Hennigan LLP, Los Angeles, California, following our ordinary business practices.  I am readily familiar with Hueston Hennigan LLP's practice for collection and processing of correspondence for mailing with the United States Postal Service.  Under that practice, the correspondence would be deposited in the United States Postal Service on that same day in the ordinary course of business.

I declare under penalty of perjury that the above is true and correct.

Executed May 26, 2023, at Fort Worth, Texas.

_____
Marina G. Green

- 1 -

6392840